Good morning and may it please the court. Kevin Green for the appellants and I would like to reserve five minutes for rebuttal given that there is a cross-appeal here and this is a slightly longer hearing and I want to start with a housekeeping point and that is that a lot of the record and I think all of the merits briefs are under seal and we think that's a little excessive but given that there was no request in advance to close any of that for discussion here I'm not going to distinguish in my discussion of the record that one way or the other. Thank you for reminding us about that. I take it that was the sealing done at the request of the defendant? That's correct and we would not object to unsealing it at this stage but that's not really our issue. In preparing for this hearing, I was reminded of something I heard Judge Owens say recently in the CLE program about the function of oral argument that I think is relevant and helpful here and he said that by the time of argument we are really past your briefs, past your briefs and we're thinking about how to write the opinion and that case is where I've mulled that over and I think it is relevant here in light of how the district court addressed the summary judgment motion and in particular today I want to talk about three options or three approaches for how this case could be sent back under a different rationale and the first one is the notice point on summary judgment and that is the district court's reasoning that the expert's deposition excerpts were not authenticated. But counsel, the district court specifically didn't rely on that. I'm looking at ER 6, nevertheless, even if arguendo the court were to consider those excerpts, Donahue only testified that the class bar functioned the way it was designed. He did not testify that the design was defective and to me the rationale of the district court granting summary judgment was that the design, the car weren't defective and he looked at all of the evidence that you're saying he definitively excluded and I really have a lot of trouble understanding your argument given what the district court actually said. Well, I think the most important component of the expert's testimony, Mr. Donahue, was he said after all of his testing and in contrast to the prior hearing there was no effort to exclude him. He was accepted as an engineering expert. You spent a lot of your brief talking about the district court erred in relying on this authentication issue to not consider the testimony but then the district court went ahead and considered the testimony and were reviewing summary judgment de novo anyway but the district court didn't exclude him. Well, the district court didn't fully consider it and I'm glad the court asked that question because I think the most important component of the expert's testimony is after all of his study of the range extender he said I could see situations where this could present some safety problems. He said specifically testified I am not testifying this car was defectively designed, right? He didn't say that it was not defective. He said I'm not offering an opinion. Well, that's the same thing, right? He was specifically asked by your friend or your friend's law partners, are you offering any testimony on this subject and he said no, not unless I'm asked to do more work, right? Correct, but that's the ultimate issue of defect which if he had opined yes, there is a defect and you get into issues of can he testify on that and we address this in our briefs that sometimes that's improper to do. So, I don't think that is essential to his testimony or to our case on summary judgment. Okay, I was just going to suggest let's just assume that we agree with you on this authentication point and that we're going to fully consider your expert's testimony. Understood. Because you have three and so that was the first one. Let's just get that one out of the way. Understood. What's number two and then number three? Okay, understood. I didn't want to draw on that, but okay. I just think you're right on that point, but I think Judge Bennett is also right that maybe it ultimately doesn't matter. Well, I think it does matter because it really set a grudging tone for how the court looked at it and what was really a terrorist order that didn't address it. We reviewed this de novo. So, you have to convince us that you have a case that states a claim and has evidence in support and goes forward to trial. So, we don't care what the district court said. You have to tell us why you survived summary judgment. Understood. Understood. And that's my second point and that is why are there tribal issues of fact on design defect? A lot of emphasis from the other side that was only his expert, but the evidentiary case was broader than that. And in particular, we've got a massive record here and I don't have all the ER sites at my fingertips, but if I could invite the court's attention to one document at ER 3009. And this is a section of the record that collects BMW's own studies and testing of the REX in 2013 before it went to market the following year. And the testers found that the sudden deceleration, what BMW calls, I think euphemistically power limitation, but the sudden deceleration of the car, the limp mode at the reduced power level, could be considered problematic to safety. This is BMW. But counsel, is it your claim that you can survive summary judgment even if the limitations of the car were disclosed? And even though this is not a tort claim, because BMW could have designed a more expensive, theoretically safer car, that that survived summary judgment even if there's no evidence that anybody lied to the class or that this wasn't disclosed? I think the record, and I don't think there's an argument from BMW identifying where what we are alleging and have proved through evidence was disclosed. And that is the sudden deceleration. They put in the owner's manual. They put in the owner's manual that power could be reduced. That's all they said. They didn't say there would be sudden deceleration on hills or in hot or cold weather and causing limp mode, for example, on the freeway where your car basically has a form of engine failure. And all these plaintiffs testified to this. I mean, that's really BMW's view of the case that is disputed. It creates tribal issues of fact. With a very low charge state, the drive power is reduced on sharp uphill curves or at high speeds in order to allow further driving. The power reduction is displayed on the performance display. If the high voltage battery heavily discharged, the performance reduced step by step. So you're saying that is inaccurate and not enough. Your Honor, if I could ask what are you reading from? I think it's the, sorry, it's, I think ER 2460 and 2461. I think the same thing as in ER 2705 and I believe those are the owner's manuals. You know, none of this was disclosed in the owner's manuals of what the cars actually did and the evidence showed. And BMW, in fact, doesn't dispute that the plaintiffs are not required to read the owner's manuals front page to the end when they buy the car. That's not legally expected of them. Most people wouldn't do that. I mean, they're like phone books for cars these days because they're so complicated. But Judge Bennett, what you're articulating I think is the clash of evidence in this case. That's BMW's position. And they've come in, they've said, oh well, this was in the owner's manual. Well, what we're alleging and what we've shown by way of evidence was not mentioned or disclosed to anybody. That's why this case was brought up. Your point is that when you talk about a reduction in power, that doesn't communicate that you're going to have a reduction in speed. Well, to the extent of going from, say, 65 to 40 on the freeway. And here I'm going to pivot to another part of our evidence and that is the consumer complaints. The answer is yes. Your argument is that a reduction in power doesn't communicate a reduction in speed. It doesn't communicate what actually occurred. It says a reduction in power is vague, innocuous, it's buried. It didn't convey, even if it had said, and we've said this repeatedly in our briefs and I've given the site support there, that the cars would have a serious reduction in power throwing them in essentially into limp mode. Going from, let's say, 60 to 45. And so you have the consumer testimonials that they weren't told that this could happen. And thus we have BMW's argument, which is essentially a defense on summary judgment or better for a trial, that, well, it was a mega city car. And that's how we marketed it and that's how everyone understood it. It was just meant to be driven in cities. And so there isn't really any disagreement that this is actually what happens to the car. I mean, it's downplayed. But there's no argument that this, in fact, does not occur. This is the car. Go ahead, please. So under California law, if you're trying to allege a design defect, I think if it's not common experience of the ordinary consumer, you need an expert. That's Campbell versus General Motors Corporation and probably other cases, too. Why do you not fall under that? Why do you not need an expert to talk about whether this is a design defect? For a host of reasons, I think, Your Honor. Everybody drives cars virtually, right? But not everybody drives an electric car with this booster thing. I mean, this is not common experience, is it? Limp mode is common experience. The effect of the defect is common experience. I mean, otherwise, if. If you don't have enough gas entirely in a gas car, your car's going to stop and lose power. You're going to have limp mode or worse, right? So why is this? I mean, that's normal. This is something else that has to do with electric cars with boosters, and that doesn't seem like a common experience. So I'm not sure why this is something everyone can evaluate. Well, even if we took that as a given, we did have an expert here, and he was not excluded. But he didn't talk about whether it was a defect. He talked about the safety issues that were presented, and safety is at the core of what defects can be addressed in consumer fraud law. Well, not just the cars. At ER 700, you would agree with me that the car, as it is designed, does not present a safety risk to the majority of its users. And his answer to that was, I could see certain situations where this performance could present some safety problems. Do you have anything better than that in his testimony? That is his testimony. And the point I do want to make, and this is the reason I referred to that document, is BMW reached these conclusions itself. Why test the car on inclines or in hot or cold weather, unless you know people are going to use it that way? And then you've got an internal report saying that it creates, and again, this is 3009 of the ER. It creates a driving situation that affects safety. Potential customer complaints. And that's before the car went to market. So their testers knew about it. And at 3013 of the ER, and this is another internal document. This is BMW. This is not our expert saying this stuff. Talking about the same thing. The sudden deceleration, not just reduction in speed. There is a difference, and that's critical to this case. This produces hazardous traffic situations from back-dip traffic. And that's part of our evidentiary case. And we don't have to prove it now. It was BMW that moved for summary judgment. And does this create a tribal issue? Along with our expert, the plaintiff's testimony, as to their experiences with the REX. And the customer complaints. And BMW's arguments. We'll hear more about them in a minute. But as a full disclosure, we're aware. I mean, none of this. It was not in the owner's manual. It was advertising. If it appeared in the papers, it wasn't there. So what these documents say, is not just that BMW was aware of it and tested for it. But knew about it. Knew about it. And marketed the car anyway. And in fact, they could have fixed it. And this is in our briefs. That there could have been a software fix. But so again, your view is, they weren't allowed to sell this car in this condition. Correct. That's correct. In light of how the car performs and what they knew about it. And your expert's conclusions were, these vehicles will be unable to maintain highway speeds during some prolonged steep climbs while the REX is activated. These vehicles were designed to perform this way. This is not a manufacturing issue. But again, your position is, with the evidence that you've submitted, BMW was not permitted to sell this car without being subject to liability. That sounds like a primrose path. And I will try to answer the question. I think they sold the car knowing that it had this issue. And so it's created the legal issue of, is this a design defect? Yes, it was designed to do that. But does it rise to a defect in the eyes of the law sufficient to bring a case? I mean, we brought, there were two motions to dismiss that were defeated. And then a class was certified. And then we get to summary judgment. And it's a very short order. And I understand that to review this de novo, this court is really being asked to look at a lot of this de novo, all the state laws and all the rest of it, which is not the function. So if we disagree with you and think that in California, for a California claim, you do need an expert for this type of design defect claim, are any of the other states more plaintiff-friendly than California? Because you have other states here. So can you point us to something that says, well, if that happens, my other state claim survives? I can only refer Your Honor to our briefing on that, where we addressed the other state laws on that, not requiring an expert. And again, on the record in this case, it's a different point whether the expert's testimony is sufficient. But there is an expert here. I mean, he was not excluded. So unless the court has any further questions, I'll reserve. Okay, very good. Let's hear from the anti-Judas lawyer. Good morning, Your Honor. This is Eric Kazarian on behalf of LE and Cross Appellate BMW of North America with me at counsel's table with my colleague, Zurich, Zurich. A little housekeeping issue before I start the argument. I know we have a cross appeal. Does the court have a preference on when they hear argument on that, or if at all? Because I'd like to reserve time for that. It seems like you probably don't even want us to talk about the cross appeal unless you lose, right? 100%. In fact, you prefer we don't, probably. Also 100%. Why don't we see how far we get on the main appeal, and then if there's time left, you can see if there's something you want to say about the cross appeal. Okay, thank you very much, Your Honor. The district court's summary judgment order should be affirmed here because it correctly focused on the issue that plaintiffs lacked evidence of any defect in this case. And this was a foundation obligation for all their causes of action in this case. And lacking this evidence, they could not then pivot to a tort consumer expectation test to fill that evidentiary gap. What is important here, and what distinguishes this case from almost all the other automotive cases that routinely come before this court, this is not a product that is malfunctioning. This is not a product that has a component failure. What is happening here is a product that is performing. Has BMW designed it? And has BMW disclosed it would perform? Counsel, would you agree that they could have survived summary judgment if they had had testimony that this product was unreasonably dangerous to the user or consumer? In the abstract, it's hard for me to say that because what is important here is that there are cases where an unreasonably dangerous product or safety concern may arguably be evidence of a defect. That's not this case. That's a different case. And the reason for that is in each of those cases where there's a safety issue that is alleged, it's a product that is malfunctioning. It's a product that is failing while operating. And so you have an element of consumer surprise in the sense that you're driving down the road, all of a sudden the car just goes haywire on you and you're caught off guard. That's not this case. This is a case where the car was designed and marketed as a mega city vehicle as part of the testing that Counsel referenced, all of which, by the way, was pre-sale. 2013 was before these cars hit the market. That testing was done for the exact reason that the disclosures were provided to understand what are the scope and limitations of this product. Let's just put aside the disclosure point. Because I think that's probably contestable here, but you can persuade me otherwise, perhaps. But let's just assume that you never told anyone about this. Right, so the person who drives the car, they don't realize that when... You helped help me with the figures. The charge is below 2% or something. Correct, 1.9%. Yeah, that if you drive it in certain conditions, you are going to... I think the expert said there could be scenarios in which that would pose a safety concern. It seems to me that you don't tell people that so that they can prepare for it and either avoid the situation or know to... Like, I better get over to the right lane so I'm not in the fast lane when this happens. That could be a defect. It certainly would be a surprise to most people when I'm driving my car and it's getting down to empty. I don't expect the damn thing to stop working. I expect, okay, we're getting close. I know I better get to that next gas station, but I don't think before it hits empty that it's going to stop or I'm going to only be able to go 40 miles an hour. So the car doesn't stop, but I think Mr. Donahue addressed the primary point Your Honor is making, which is before the car went into reduced power, a pop-up display warns the driver. So this is, again, hey, you're about to... Speed and power may be limited. When that happened, Mr. Donahue said he was safely able to pull over to the right side. And so, again, the safety issue that is there... By the way, Mr. Donahue is an engineering expert. He's not a safety expert, so let's put that aside for a minute. He was not designated to a plan on safety. His report doesn't even mention the word safety anywhere. To the extent he was applying... This is similar to what was in the previous appeal. To the extent he was supplementing his opinion to provide a safety opinion at deposition, Rule 26 says they had to supplement that report and put that in there. They never did that. So there was no evidence of safety, as far as I'm concerned, for a host of reasons. That's all. I should know this, and I apologize that I don't remember, but it was their testimony about how there's something in the display that is listing the percentage of charge that is left. The percentage of charge is always on the car. So, like, if you're... Even without any disclosures, if you're down to 3%, the driver is going to be seeing 3%. Correct. It not only gives a percentage, there's also a blue bar that Mr. Donahue testified in his deposition that says what's the amount of power that's left to be delivered. So there's kind of a... The warning is not just a pop-up display, but also a reduction in power. Now, what's also important... Sorry, a reduction in the power bar that's always on as well. What's also important about Mr. Donahue's testimony is the fact that even when he dropped it, he tested his car in multiple different settings, most predominantly in the city setting, and he drove it down to 1.9%, and he said, I tried, I see no possible way. This could be a problem. So what did he do? He took it up into the mountains, long outside of Phoenix, drove it 70 miles, drained it down to 1.9%, and finally he was able to trigger the condition that they're claiming is a defect. All for what? A car that was marketed and sold as a megacity vehicle, as a car that is used in cities not to go skiing to the mountains or anything else. Was there testimony in the record about how cars without this REX perform? Well, cars... So cars... There isn't, I don't think, but cars without this range extender perform by stopping. Is that in the record? I believe Mr. Donahue was asked what would happen if there was a range extender or any power... Basically, if you get down to zero, it's the same as if you run out of gas. What about if you don't have the range extender and you get down to 1.9% and you drive it up a mountain? It would behave the same way. By the way, I would note, this is not unique to the BMW. It's an electric vehicle issue. I think that's in the record as well. There's a reduction in power because what's going to happen is you're getting down to zero at that point. An immediate discharge of the battery not only harms the battery, what it does is it could strand you right in the middle of the street. So there's a reduction in power to allow you to start pulling over here so you're not a traffic obstacle. If you look at the record, and I can get to the slide for this, the Nissan Leaf, which is another electric vehicle, does not have a range extender, has something called turtle mode. Turtle mode is literally a light comes on with a turtle when you're about to have a reduction in power because your battery is at a critically low level. I believe Tesla's behave the same way. The reduction in speed and power is done for the protection of the consumer and for the protection of the battery. Can I ask you about this mega city thing? I understand that the strategy for selling this car was to focus on mega cities, but were consumers told don't drive this outside the city or don't move out of the city if you have this car, you better sell this car? I think it's an atmospheric point you're making that doesn't really translate to what consumers might do with the car. Certainly there were no limitations on where you can drive the car. It would be enforceable. The marketing theme sets the purpose of the vehicle from an implied warranty perspective. Is that going to be true in BMW's head and no one would know that when they're buying the car? That's what I'm asking. Were the purchasers told this really is only designed to work in the city? I think the marketing says what it says. I don't have evidence of direct communications between dealers and consumers on what's the intended purpose of the vehicle that you're buying it for, etc. What they were told, though, and I want to make sure the record is clear on this, the disclosure was not just in the owner's manual. The disclosure happened through multiple sources. Number one, it clearly was in the owner's manual. Number two... And that's why I want to focus on the other two sources. The disclosure was made... BMW, before the vehicle was sold, had training sessions with dealer personnel. And this training session occurred yearly, not just when the car was there in 2014, and I hope people can forget in 2016. Every year, they had training sessions and among the different things that were disclosed and this is in the record, was this power reduction issue. On top of that, as is common when a brand new product hits the market, BMW made the car available to the media. Hey, take it out for an extended test drive. See what you think. And the purpose of that is so people can write about hey, this is a great product, or Consumer Reports makes a whole business out of this. And Consumer Reports, not incidentally, was one of the companies that tested this product and wrote about it and in that report said, by the way, if you want to test the limits of this range extender and really drain it down to 1.9%, you might not get the full speed and power. This is not a highly kept secret by any means. This is not BMW kind of pushing under the rug a potential problem so that it could sell a car. It was forthcoming. It was in the information. It was on the chat blogs. The people that drive these cars, they're tech savvy. They read information about it. And some of these plaintiffs knew about it. The survey evidence showed that something like, I don't know, a third of the people who buy the car, they weren't aware that this was an issue. Notwithstanding this training and whatnot that you've talked about. Correct. There was some percentage of people that didn't know about it. That's not surprising for a host of reasons. Two of these plaintiffs said they bought the car with no research at all. It was kind of a big purchase as one of them said. That seems problematic from the standpoint of your argument that somehow when we fully disclosed it, everybody knew about this. Because not everybody knew. It's not problematic because in a consumer protection case, we're not focusing on the actual knowledge of the consumer. We're focusing on the conduct of the defendant. And the conduct of the defendant here, we disclosed it. Whether these individuals did the research or found this information, we can't be faulted for their lack of diligence in that instance under consumer protection law, which is what's at issue here. And going back to an earlier question that I asked, if this were a tort claim, that might not help you. That is correct because tort claims are also governed by completely different standards. It's retrospective because the interest that is being protected by tort law is completely different. The interest that is being protected by tort law is the consumer's right to be free from a product that will injure them physically. And here the damages are economic. It's all economic. That's why it's a punitive class action and not a personal injury case. By the way, there's no evidence that any of these plaintiffs suffered personal injury either. That's what we have here is lack of evidence of a defect from an expert that not once, not twice, but in response to five different questions, unambiguously said I'm not opining on this. And their pivot to the consumer expectation test does not help them because from a policy perspective it just can't be imported to hybridize product liability and personal injury law, but putting that on its most basic level, the consumer expectation test is the product within the ordinary experience of the ordinary consumer. And I think plaintiffs themselves really shoot themselves in the foot on that one. At two SCR 68, Supplemental Exercise Record, in their opposition to their summary judgment, they expressly say, and I memorize it because it's such a shocking quote, plaintiffs are ordinary consumers with no experience with electric vehicles or generators. Yet, we are being asked to not only import the product liability principle of design defect into this case, but let them testify, despite their admission of lack of knowledge, that this was a defect in their view. And I think you really have to cross several barriers to get there. Even if the consumer expectation test were to apply in this case, they certainly haven't laid the foundation by way of their admission in particular that they're not in a position to argue this. And let's talk about what's important here also is that they designated an electrical engineer with expertise and knowledge, presumably the training. They make a big deal about the fact that we didn't challenge his qualifications. Well, he's an electrical engineer. He did what he said he was supposed to do. We didn't file the motion for the sake of filing the motion. But this same electrical engineer said when pressed, is this a defect? He said, I'd have to do a lot more work on this. He's not familiar with this product. He's not familiar with this technology. He wasn't prepared to apply it on defect. How could a consumer who's never bought an electric car do the same thing? Yes, I guess as a conceptual matter, I don't think you're right on this point. But tell me if, I just want to put the more extreme hypo that I was before where the car stops and gets down to 1.9% and just stops. No, you haven't disclosed that, let's say. I think a consumer, even someone who admitted I have no familiarity whatsoever with these batteries and how they work, a consumer would naturally expect again, like I said, I still have a little bit of power. This thing is going to at least get me to, you know, that's why I was analogizing to a gas tank. I mean, I know I'm running a risk, but I can still see that there's gas in there. I don't expect it to just stop before it gets to empty. So if that were the problem here, I could say, yeah, a reasonable consumer would expect that until the thing gets to empty, it's going to keep running. And they wouldn't have to come up with an expert who would say that the thing is defective if you don't disclose that. Again, we're talking about a different defect at this point because nobody's yet... Yeah, conceptually... I think my example proves it, but that's why I was trying to... And I agree, that's why I started by saying this is not a case about a product malfunction. If the product was malfunctioned... That's what I'm saying. You know that the car will stop when it gets to 1.9%. That's, you've tested it, you designed it that way to protect the battery. You don't want it to risk completely discharging. So you design the thing so it just stops at 1.9%, and you don't tell people about that. They don't need an expert to come in and say, this thing is defective if there isn't disclosure, right? So I don't think their reliance on the consumer expectations test is just off, you know, coming out of bounds. Well, in that hypothetical, perhaps, Your Honor, but we go back to the threshold issue of from a policy perspective, can the consumer expectation test, which is a highly circumscribed substitute for design defect. So it's not that you can just throw it out there in any case. The policy underlying that is, again, to protect against physical injury, not against economic harm. And the Lassen case, which we cited, Judge Barat went through extensive analysis on that issue, and I think correctly, because he says, look, the consumer expectation clearly has a place in design defect jurisprudence, and nobody's disputing that. The question is, in what cases should it be brought in? Is that in economic injury cases where the interest we're protecting is the belief that somebody overpaid or should not have paid for a product, or in the cases where somebody's injured physically? And I think there's good reason to use it in the personal injury space, and there's no dispute that that test is used liberally in the injury space. All the cases that plaintiff cite from the various jurisdictions, sure, there's no dispute that consumer expectation is allowed. Each of those cases, though, each involved physical injury. That's not this case. And this hybridization of filling the gap that an expert left because a consumer feels it should perform differently, that's not from the consumer expectation. I think there's a case that this Court had on a similar, not quite similar, but similar to the hypothetical you're identifying, Your Honor, it's called Kramer v. Toyota Motor Sales. It's a panel decision that's unpublished from 2016, but I think it's appropriate. In that case, the expert was excluded altogether, and all that was left was plaintiff testifying about their own experience with the product, which happened to be a product failure, I believe. And this Court said in affirming summary judgment that that's not evidence of a defect. So perhaps the answer lies in that question. In that authority. But even if you're wrong on that, your argument is stopping at 1.9 is not the same as what is occurring here. Right. There's evidence that the car is stopping at 1.9, but yes, it's not what's happening here. It's a reduction in power in a very defined, limited driving circumstance outside of a city. And again, you're then left to say, well, is a consumer better off with an immediate discharge without a reduction in power and stopping in the middle of lanes, or limiting your power temporarily to 40 miles an hour or in speed, so that you can... Before you run out of time, why don't you tell me your best argument for if pre-judgment, why would the district court have used its discretion in finding that this was an appropriate class action where all of the supposed class cars have this REX feature, this REX feature. Why if that's a defect, it's in every car, why would the district court have abused its discretion in allowing a class action? So the court certified a California implied warranty class, so it's a very limited cause of action on the second go-around after making certain findings of fact on the first go-around. And if we assume for the sake of argument, they have evidence of a defect, that is not the only thing that is required for an implied warranty claim. It should be an undisclosed latent defect. That's what the law says under California law. There's plenty of evidence that there was disclosure here in this case. So, for example, how could it be said that a car, as some of these plaintiffs did several times over, with knowledge of how the car is supposed to work or can work at 1.9% battery charge on incline, has a claim for implied warranty? I think you would have to ask each consumer, what did you know? Why did you intend to use it for? The vehicle is a megacity car. Did you intend to use it as a megacity? Evidence of survey of actual owners said most do. Do you intend to use it direct as a backup or as a primary source of power in the vehicle? All these are individual issues. So the car, it's not that it's just failing and therefore it's not drivable in all circumstances. And I think when we asked Mr. Donahue, can you say that this defect is substantially certain to manifest in all these vehicles? He couldn't answer that question. And that highlights a very sort of individualized issue that the implied warranty claim in this case implicates, which is, he said, I need to know how they're driving and how they're using the vehicle. And if the implied warranty claim hinges on how they're driving and how they're using the vehicle, if it hinges on whether they had knowledge of how the car is supposed to work at or can work at 1.9%, those are the very types of highly individualized issues that would preclude a mass litigation of an implied warranty claim under the facts of this case. Thank you very much for your argument. Thank you. Thank you, Your Honor. I have three points on rebuttal. BMW just said something I think is rather remarkable and goes to the core of why this case was brought, and that is that the car was only intended to be merchantable, meaning fit for ordinary use within cities. So just on flat ground, or even in Los Angeles, I mean there are hills here and a car has to be merchantable for all reasonable uses, foreseeable uses, including something like this, and I think it's conceded that the car wasn't, that isn't really contested here, and that that's the heart of what the implied warranty and merchantability seeks to protect. And there are tribal issues of fact that go to whether this is a defect under that standard. Second point, I think I heard that there was no consumer surprise here, and consumer expectations are indeed important, and if this case were really just about well the car just simply slows down and everyone knows that can happen when the gas runs out, that's not what this case is about, that's not the evidence, and I just want to refer to one document, a consumer complaint, and this is at ER 761, this is somebody who was driving over Highway 17 and going to Santa Cruz, if you're familiar with that road, there are a lot of hills there, and there's no reason to think that an REX shouldn't be able to tackle that kind of road. And it was not that oh well the car would just slow down. The REX kicked on but couldn't sustain the battery level. It quickly fell to one half percent when the car lost all power. We lost power around a corner, we're almost hit by multiple cars and tractor trailers. I am shaken by this experience, and I realize that that is just one piece of evidence in a mammoth record, but there are more complaints to that effect, that this ran afoul of consumer expectations. What about your opponent's reference to the display that pops up? Because it sounds to me like that person maybe just wasn't paying attention to their car, if the description we were given this morning is actually true. It didn't tell them anything about the display, that it would be so abrupt and sudden and cause the problems. One percent popping up on the screen doesn't tell the reasonable consumer anything. I think it tells them that they're getting close to running out of power, but that's why they bought the range extender at a price of $3,800. But isn't the one percent popping up while the range extender is on? I don't have that on my fingertips right at this moment, except that they were not told. Even in that display, it was not disclosed to them that something like this could happen to you driving the car. And this is not just one complaint. There are others like it. My last point, I want to go back to where I started. And how would the opinion right here, if the case were to be sent back on summary judgment, I think one approach is that there are tribal issues of fact. Again, we don't have to prove our case, it was BMW's motion. There are tribal issues of fact on whether this is a design defect in light of the effects that it actually caused. And that is based on BMW's own documents. It wasn't just the expert and Mr. Donahue's testimony, despite the lack of an ultimate opinion on it. The plaintiff's own testimony, all of which is in the record, and the consumer complaints that I just talked about. And I think just given the brevity of the district court's analysis, that it couldn't be sent back on that basis without getting into all the state laws. Because the district court didn't address any of that. Okay, thank you very much for your argument. It is just argued as submitted. And we are adjourned for the week. This court for this session stands adjourned.
judges: WATFORD, FRIEDLAND, BENNETT